CLERK, U.S. DISTRICT COURT

AUG - 5 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROY PEREZ, | NO. CV 07-5710-GHK(E) |
|        Petitioner, | |
|    v. | ORDER ADOPTING FINDINGS, |
| RICHARD KIRKLAND, Warden, | CONCLUSIONS AND RECOMMENDATIONS OF |
|        Respondent. | UNITED STATES MAGISTRATE JUDGE |

Pursuant to 28 U.S.C. section 636, the Court has reviewed the Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge.  The Court approves and adopts the Magistrate Judge's Report and Recommendation.

IT IS ORDERED that Judgment be entered denying and dismissing the Petition with prejudice.

///
///
///
///

1     IT IS FURTHER ORDERED that the Clerk serve copies of this Order,
2 the Magistrate Judge's Report and Recommendation and the Judgment
3 herein by United States mail on Petitioner, counsel for Petitioner and
4 counsel for Respondent.

5

6     LET JUDGMENT BE ENTERED ACCORDINGLY.

7

8     DATED: _____8/3_____ , 2008.

9

10

11     _____
12                GEORGE H. KING
             UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ROY PEREZ, | ) NO. CV 07-5710-GHK(E) |
| Petitioner, | ) |
| | ) |
| v. | ) REPORT AND RECOMMENDATION OF |
| | ) |
| RICHARD KIRKLAND, Warden, | ) UNITED STATES MAGISTRATE JUDGE |
| Respondent | ) |
| | ) |
| _____ | ) |

This Report and Recommendation is submitted to the Honorable George H. King, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05-07 of the United States District Court for the Central District of California.

PROCEEDINGS

Petitioner filed a "Petition for Writ of Habeas Corpus By a Person in State Custody" on August 21, 2007. Respondent filed an Answer on January 31, 2008. Petitioner filed a Traverse on June 22, 2008.

**BACKGROUND**

A jury found Petitioner guilty of one count of the second degree murder of Jose Medina in violation of California Penal Code section 187(a) (Reporters Transcript ["R.T."] 907C-907E; Clerk's Transcript ["C.T."] 128, 130-31). The jury found true the allegations that: (1) a principal personally and intentionally discharged a firearm proximately causing great bodily injury and death within the meaning of California Penal Code sections 12022.53(d) and (e); (2) a principal intentionally discharged a firearm within the meaning of California Penal Code sections 12022.53(c) and (e); (3) a principal personally used a firearm within the meaning of California Penal Code sections 12022.53(b) and (e); and (4) the offense was committed for the benefit of a criminal street gang within the meaning of California Penal Code section 186.22(b)(1) (R.T. 907C-907D; C.T. 128, 130-31). Petitioner received a sentence of fifty years to life (R.T. 910-11; C.T. 132-35).

The Court of Appeal affirmed the judgment (Respondent's Lodgment 6; see People v. Perez, 2004 WL 2050649 (Cal. Ct. App. 2d Dist. Sept. 15, 2004)). The California Supreme Court denied Petitioner's petition for review without opinion (Respondent's Lodgments 7-8).

Petitioner filed a habeas corpus petition in the Los Angeles County Superior Court, which that court denied in a brief order on March 7, 2006 (Respondent's Lodgments 9, 10). Petitioner filed a habeas corpus petition in the Court of Appeal, which that court denied on May 11, 2006 (Respondent's Lodgments 11, 12). Petitioner filed a habeas corpus petition in the California Supreme Court on June 30,

2

2006 (Respondent's Lodgment 13).[1]  The State filed an informal
response on July 5, 2007, and Petitioner filed a reply to the informal
response on July 24, 2007.[2]  The California Supreme Court denied the
petition without opinion on August 29, 2007 (Respondent's Lodgment
16).

**FACTUAL SUMMARY**

## I.    Prosecution's Evidence

### Edgardo Perez

Edgardo Perez testified as follows:

On the evening of June 21, 2002, Edgardo Perez ("Edgardo") met
Jose Medina (the victim) and Jesus Galindo at a bar in South Gate
(R.T. 42).[3]  The three men eventually left the bar, visited another
bar, and then picked up Galindo's brother, Alex (R.T. 44-45).  Medina

---

[1]     The copy of Petitioner's California Supreme Court
habeas petition lodged by Respondent does not bear a legible date
of filing in that court.  However, this Court takes judicial
notice of the docket in In re Perez, California Supreme Court
case number S144835, available on the California courts' website
at www.courtinfo.ca.gov.  See Mir v. Little Company of Mary
Hosp., 844 F.2d 646, 649 (9th Cir. 1988) (court may take judicial
notice of court records).  The docket shows Petitioner filed his
California Supreme Court habeas petition on June 30, 2006.

[2]     The docket in Petitioner's California Supreme Court
habeas case reflects these filing dates.

[3]     Edgardo Perez testified he was not related to
Petitioner (R.T. 101).  For clarity the Court refers to Edgardo
Perez by his first name.

3

1  drove his companions to a liquor store in the area where Medina lived,

2  near Manchester and San Pedro (R.T. 45-46).

3

4      Galindo and Alex went in the liquor store to buy beer (R.T. 46).

5  A man exited a white van directly behind the car in which Medina and

6  Edgardo were sitting and began to hit Medina through the car window

7  (R.T. 50).  Medina exited the car and began fighting with the man

8  (R.T. 51).  As Edgardo tried to get out of the car, another person

9  came from the area where the van was located and hit Edgardo in the

10  jaw (R.T. 51, 54).  Edgardo chased the assailant, who entered the van

11  and locked the door (R.T. 54).[4]

12

13      Galindo came out of the liquor store, and he and Medina chased

14  Medina's assailant, who jumped into the white van (R.T. 54).  The

15  white van tried to take off backwards, and the van's open door pinned

16  Medina against a pole, causing damage to the door (R.T. 54-56).  The

17  van backed up, made a U-turn, and took off (R.T. 56).

18

19      Edgardo and Medina began to chase the van, but Edgardo told

20  Medina to let it go (R.T. 59).  The two returned to find Galindo, but

21  Galindo and Alex were gone (R.T. 60).  Edgardo and Medina went to

22  Medina's house, which was a few blocks from the liquor store (R.T.

23  60).  Edgardo and Medina were at the house drinking beer on the lawn

24  when Galindo and Alex arrived to join them (R.T. 60).  The four

25

26  ————————————

27      [4]  Edgardo identified photographs of a white van as
depicting the van he saw on the night of the incident (R.T. 52-
53).  Petitioner later identified the van in the photographs as

28  Petitioner's van (R.T. 735-36, 756).

1  discussed the incident at the liquor store (R.T. 63).  According to

2  Edgardo, the men had not had any problems that night with anyone at

3  the bars (R.T. 63-64).

4

5      Medina said he needed to call it an evening, and a taxi was

6  summoned to take the others back to Edgardo's car at the first bar

7  (R.T. 66, 70).  A "bluish" car with tinted windows and two people in

8  the front seat drove by twice, "real slow" (R.T. 67, 69).  Edgardo

9  asked Medina who the car's occupants were, and Medina said he did not

10 know (R.T. 67).

11

12     About ten or fifteen minutes later, Edgardo saw a man walking in

13 the street and hiding behind cars, carrying a chrome-colored handgun

14 (R.T. 70-72).  The man was wearing a blue or gray sweatshirt or jacket

15 with a hood over his head (R.T. 73-74).  Edgardo heard five or six

16 shots (R.T. 73).  After the first shot, Edgardo took off running to

17 the back yard (R.T. 73, 76).  When Edgardo returned, he saw Medina

18 lying on the ground (R.T. 77-78).

19

20     Edgardo identified the shooter as Petitioner, and also as the

21 person who earlier had walked up and hit Medina through the car window

22 (R.T. 73, 85-86).  Edgardo said he had seen Medina landing punches to

23 Petitioner's face (R.T. 88).  Edgardo testified there was no doubt in

24 his mind that Petitioner was the man in front of the liquor store

25 hitting Medina, and that Petitioner was the shooter (R.T. 87, 90,

26 112).

27 ///

28 ///

1        Edgardo recalled describing the shooter to police as being about

2   22 or 23 years old and 5'8" or 5'9" tall, with dark skin and a bald

3   head (R.T. 80, 87).  Edgardo did not recall any facial tattoos (R.T.

4   98).  Edgardo picked Petitioner's photograph out of a "six pack" photo

5   array, and wrote the following statement: "Person without mustache

6   looks like him.  He was the shooter" (R.T. 82-84, 424).  Although this

7   statement is unclear, at trial Edgardo said he thought that Petitioner

8   did not have a mustache on the day of the incident, and testified that

9   at the time of the six-pack identification Edgardo wanted to make sure

10  that the officers were aware that Petitioner's photo looked like that

11  of the shooter but "he didn't have a mustache" (R.T. 85).[5]  Out of a

12  total of four six-packs Edgardo reviewed, Edgardo saw no one else who

13  looked like the shooter (R.T. 85).

14

15  **Jesus Galindo**

16

17       Jesus Galindo testified as follows:

18

19       Galindo had known Medina for approximately ten years (R.T. 138).

20  Galindo and Medina were former gang members (R.T. 139-40).  Galindo

21  had seen Petitioner in the neighborhood a couple of times, and knew

22  that Petitioner hung out at 81st and Hoover (R.T. 155-56).  On the

23  evening of June 21, 2002, Galindo and Medina met Edgardo Perez at a

24  bar in South Gate (R.T. 141).  The three then picked up Galindo's

25  brother, Alex Molina, and went to the Felix Bar in Compton (R.T. 141).

26  _____

27      [5]   The photograph of Petitioner in the six-pack showed
Petitioner with a mustache (see Respondent's Lodgment 13:2,

28  Ex. P, referenced in Traverse, p. 8, n.2).

1  At the Felix Bar, someone bumped Medina or Alex, and a "little

2  discussion" ensued, but there was no fight (R.T. 145-46). Galindo

3  said he did not recall seeing the men involved in the confrontation

4  later that evening, but also testified that the person who exchanged

5  words at the bar looked like Petitioner (R.T. 146, 323).

6

7     Galindo and his companions then went to a store to buy beer (R.T.

8  142). Galindo and Alex entered the store, and Medina and Edgardo

9  stayed in the car (R.T. 145-47). A man walked into the store and said

10  Galindo's friend was getting "jumped" (R.T. 147). Galindo ran outside

11  and saw Medina fighting with someone (R.T. 147). At trial, Galindo

12  said he did not see in court the person with whom Medina was fighting

13  (R.T. 147).

14

15     Galindo ran toward Medina's assailant, swung at him, and chased

16  him toward a market (R.T. 148). The driver of a white van, who was

17  wearing a black jacket, exited the van (R.T. 148, 308). Galindo

18  thought the driver possibly was armed (R.T. 308). Galindo said the

19  driver was not Petitioner (R.T. 325).

20

21     Medina's assailant jumped into the van (R.T. 148, 308). At one

22  point the van drove around the parking lot trying to run Galindo over

23  (R.T. 148). The van drove around the block, came back, and stopped

24  (R.T. 309). The van's occupants appeared to be trying to pull

25  something out from the bottom (R.T. 309). Galindo ran up and tried to

26  hit the van's passenger (R.T. 148, 309). The van took off, and Medina

27  and Edgardo took off chasing the van (R.T. 148). Shown photographs of

28  the van Petitioner later admitted using, Galindo identified the van as

1  the same van that was outside the liquor store on the night of the
2  incident (R.T. 149, 735-36).

3

4      Galindo and Alex met up at a nearby gas station (R.T. 150).  Two
5  or three minutes after the van left, a Cadillac rolled up (R.T. 150).
6  Galindo identified a photograph of the car driven by Guillen as the
7  Cadillac he saw at the gas station (R.T. 150).  The occupants of the
8  Cadillac said something, but Galindo did not recall what was said
9  (R.T. 150).  However, Galindo said he "believe[d]" he told an officer
10 in an interview that when the blue car pulled up, a male Hispanic with
11 a bald head asked Galindo where Galindo was from, and said "this is
12 18th Street hood" (R.T. 151).  Galindo said he "most likely"
13 remembered hearing this statement (R.T. 151).

14

15     Galindo and Alex met up with Edgardo and Medina at Medina's home,
16 where the men drank beer outside in the front yard (R.T. 151-52).
17 Galindo saw a blue car with tinted windows, which appeared to be a
18 Cadillac, drive by several times, but said it was not the same blue
19 car he had seen earlier at the gas station, although it appeared
20 similar (R.T. 152-53, 328-29).  Several times the car slowed and
21 stopped in front of Medina's house, then drove off (R.T. 154).
22 Someone called a taxi for Alex (R.T. 313).

23

24     Galindo saw Petitioner walking on the sidewalk and then in the
25 middle of the street (R.T. 155).  A taxi was driving behind
26 Petitioner, with its lights on (R.T. 160, 313).  The cab came closer
27 to Petitioner as Petitioner walked in the street (R.T. 327-28).
28 Galindo did not recall if Petitioner had facial hair or a facial

1  tattoo (R.T. 314-15).

2

3      Petitioner pulled out a chrome object, and Galindo told his

4  companions: "this guy is going to start firing" and "[w]atch out"

5  (R.T. 155, 315).  Petitioner was wearing a jacket similar to that

6  later retrieved from Guillen's closet, with the hood pushed back from

7  the hair line so that one could see that Petitioner was bald (R.T.

8  157-58, 616).

9

10     Galindo saw Petitioner point a gun at Galindo and his companions

11 in the yard (R.T. 161).  When Petitioner started firing, Galindo took

12 off toward the back of the house (R.T. 161).  Galindo ran back in

13 response to his brother's screams and saw Medina lying face down on

14 the ground (R.T. 162).  Petitioner fired one more round from a

15 distance of approximately 12 feet and took off running (R.T. 162-63).

16

17     When the police arrived, Galindo told them Galindo could identify

18 the shooter, and that the shooter hung out at 81st Street and Hoover

19 (R.T. 163).  On June 22, 2002, police showed Galindo four photo six-

20 packs (R.T. 163).  Galindo picked Petitioner's photograph as that of

21 the shooter, and wrote: "He's the one who shot Medina" (R.T. 164-65).

22 Galindo did not see Guillen shoot Medina, and said he had never seen

23 Guillen before the trial (R.T. 167).  Asked if he had any doubt that

24 Petitioner was the shooter, Galindo responded:  "It was him." (R.T.

25 167).

26

27     Galindo said he did not remember whether Galindo saw the person

28 involved in the encounter with Medina at the second bar later walking

9

1   down Medina's street, but did say the person at the bar who bumped

2   Medina "could be" the shooter (R.T. 323).

4   **Kodili Azoma**

6   Taxi driver Kodili Azoma testified as follows:

8   In the early morning hours of June 22, 2002, Azoma was driving

9   his taxi on 88th Street on the way to pick up a fare, with his

10  headlights on (R.T. 334-36, 344).  Azoma saw people standing in front

11  of the address to which he had been called (R.T. 336).  As Azoma

12  approached the house, someone was walking in the street approximately

13  35 feet in front of Azoma's cab (R.T. 335).  The person was small,

14  about 5'5" and 140 or 150 pounds, and wore a dark jacket with a hood

15  (R.T. 337-40).  Azoma said he did not recall the color of the man's

16  pants, but that if the pants had been white or another color Azoma

17  would have noticed, so he thought the pants were dark (R.T. 341).

19  Azoma drove approximately 20 feet behind the person in the street

20  (R.T. 245).  Azoma heard four or five shots coming from the person in

21  front of Azoma (R.T. 336-37, 344).  Scared, Azoma backed down the

22  street (R.T. 340).

24  **Nathan Kouri**

26  Police officer Nathan Kouri testified as follows:

28  At approximately 2:20 a.m. on June 22, 2002, in the area of Main

1   and 87th streets, Kouri pulled over a Cadillac containing four male

2   occupants for a traffic violation (R.T. 347-48, 350).  The occupants

3   exited the car and Kouri spoke with them (R.T. 348-49).  The car's

4   occupants admitted that they were members of the 18th Street gang, and

5   that they hung out in the area of 81st and Hoover (R.T. 351, 357).

6   Kouri filled out field identification cards for three of the men, a

7   procedure used when he makes contact with known or suspected gang

8   members (R.T. 349-50).  Kouri filled out field identification cards

9   for Petitioner, Marvin Guillen (the driver), and George Rojas (R.T.

10  352-53, 355).  Kouri did not note on the card any "E" tattooed on

11  Petitioner's face, although Petitioner had such a tattoo at the time

12  of trial (R.T. 355-54).  Another officer filled out a field

13  identification card for passenger "Freddy Fernandez" (R.T. 364).

14

15      Later, around 3:45 a.m., Kouri was at the station when he heard a

16  radio call of shots fired and a man down (R.T. 359).  Kouri responded

17  to the call and spoke to Galindo, who said he, Galindo, would be able

18  to identify the shooter, and that the shooter hung out at 81st and

19  Hoover (R.T. 359).

20

21      Around 6:00 a.m., Kouri and two partners went to the address

22  Guillen had given during the traffic stop (R.T. 360).  There, Kouri

23  saw Guillen drive up in the car that Kouri had pulled over during the

24  traffic stop (R.T. 361).  Guillen was not accompanied by the three men

25  Kouri had seen earlier (R.T. 361).  Guillen said he had just dropped

26  off one of the other persons in Pasadena (R.T. 352).  Inside the car,

27  Kouri saw a hooded long-sleeved shirt, later identified as the shirt

28  found in Guillen's closet (R.T. 362, 616).

1 | **Detective John Zambos**

2

3     Los Angeles Detective John Zambos testified as follows:

4

5     At approximately 6:00 a.m. on June 22, 2002, Detective Zambos,

6 the assigned investigating officer, arrived at the crime scene and

7 spoke to witnesses (R.T. 419-21).  Edgardo Perez said the shooter was

8 5'8" tall, 150 pounds, and between 18 and 23 years old, with dark skin

9 and a bald head, wearing a blue hooded sweatshirt (R.T. 611).  Taxi

10 driver Azoma described the shooter as a male, five feet five inches

11 tall, 140 pounds, wearing a dark jacket, dark pants and a hood (R.T.

12 428).

13

14     Zambos and others put together four six-packs, each one of which

15 included one of the four men in the car that was the subject of the

16 traffic stop, _i.e._, Petitioner, Guillen, Fernandez and Rojas (R.T.

17 421-22).  Zambos showed the six-packs to Edgardo Perez at 4:00 p.m.

18 that same day (R.T. 422-23, 612).  Edgardo said he thought

19 Petitioner's photo was that of the shooter, "though he didn't have a

20 mustache" (R.T. 423, 612).  Edgardo wrote: "Card D, Photo 5, person

21 without mustache looks like him.  He was the shooter." (R.T. 424).

22

23     Alex Molina was unable to identify anyone from the six-packs, but

24 appeared very scared and nervous and said he did not want to get

25 involved (R.T. 424).  However, Alex said he thought the shooter was

26 the same person who had bumped Medina earlier outside the bar (R.T.

27 614).  Alex described the shooter as between 5'10" and 6'1" tall, 180

28 to 190 pounds, with a gray hooded sweatshirt and light blue jeans

1 | (R.T. 614-15).

2

3 |     Zambos went through the six-packs with Galindo, who identified
4 | Petitioner as the shooter (R.T. 425-26).  Galindo said the shooter was
5 | a male Hispanic wearing a blue coat (R.T. 426).  Galindo identified
6 | Guillen's Cadillac as the car he saw driving around just prior to the
7 | shooting (R.T. 427).

8

9 |     At the time of Petitioner's arrest on July 17, 2002, Petitioner
10 | was five feet, five inches tall, 145 pounds, 21 years old, and had a
11 | mustache and a "E" tattoo on his face (R.T. 428, 624).  At the time of
12 | his arrest, Petitioner's face bore no bruises or evidence of being in
13 | a fight (R.T. 624).  A search of Petitioner's home revealed a .357
14 | magnum revolver and live rounds of various calibers (R.T. 429).

15

16 |     Zambos interviewed Guillen at the police station on July 17, 2002
17 | and July 24, 2002 (R.T. 605).  A redacted version of the July 24, 2002
18 | taped interview was played to the jury (R.T. 606-09).  In the July 17
19 | interview, Guillen said Petitioner got the gun from "Cave's" house
20 | (R.T. 618-19).  In a subsequent interview, Guillen said that
21 | Petitioner had picked up the gun from "Smoky" (R.T. 618).  Guillen
22 | also said Petitioner had brought the jacket over to Guillen's house
23 | approximately 7 or 8 o'clock on the morning after the incident (R.T.
24 | 622).  Zambos recovered the blue jacket from Guillen's closet during a
25 | search on July 17, 2002 (R.T. 616).

26

27 |     The field identification card for Petitioner that officers filled
28 | out at approximately 2:20 a.m. the night of the incident recorded that

1   Petitioner was wearing tan boots, a white T-shirt, and tan pants (R.T.

2   615-16).  Guillen's field identification card recorded that Guillen

3   was wearing blue jeans and a blue shirt (R.T. 616).

4

5   **Taped Interview of Marvin Guillen**

6

7       In the taped interview, which as indicated previously was played

8   to the jury,[6] Guillen related the following:

9

10      Guillen was a one-time member of the 18th Street gang's South

11  Central clique (Supp. C.T. 7-8).  Petitioner had influenced Guillen to

12  resume gang activity.  Id.  On the evening of June 21, Guillen and

13  others drove back from the beach (Supp. C.T. 10-11).  Guillen was

14  driving his blue Cadillac with two passengers, and Petitioner was

15  following in his white Astro van, accompanied by "Smokey" (Supp. C.T.

16  10-13).  Guillen and his companions stopped to get some hamburgers

17  (Supp. C.T. 15-16).  Petitioner and Smokey went to a liquor store next

18  to a gas station to get some beers (Supp. C.T. 17-18).

19

20      After obtaining the food, Guillen drove around looking for

21  Petitioner (Supp. C.T. 18, 23-24).  Guillen found Petitioner and his

22  companion on 81st Street between Hoover and Figueroa (Supp. C.T. 23-

23  24).  Petitioner appeared to have been in a fight (Supp. C.T. 19, 25).

24  Petitioner was "pissed off" and was trying to fix the door of the van,

25

26  _____

27      [6]   The Court redacted certain portions of the interview on
    pages 21 and 22 of the transcript (R.T. 413-17).  The
28  Supplemental Clerk's Transcript contains the redacted transcript
    of the interview.

1  which was "all messed up" and would not close (Supp. C.T. 24).

2  Petitioner said "Man, fuck this fool, man.  Let's go get him." (Supp.

3  C.T. 24-25).  Guillen told Petitioner to "let it go" (Supp. C.T. 25).

4  Petitioner left to give Smokey a ride home, and Guillen, George and

5  Freddie waited on 81st and Hoover for Petitioner to return (Supp. C.T.

6  25-26).

7

8      Petitioner returned with a gun and got into Guillen's car (Supp.

9  C.T. 26, 27).  At some point officers pulled Guillen over, but

10 eventually let him go (Supp. C.T. 28-30).  Guillen drove to Cave's

11 house because Petitioner said he wanted to pick something up (R.T. 30-

12 32).  Petitioner exited Cave's house with a gun (R.T. 33).  Guillen

13 drove around several times and spotted the "guys that supposedly he

14 wanted to hit" (R.T. 34).  Petitioner said those were the "guys

15 [Petitioner] got in a fight with," and told Guillen to drop Petitioner

16 off at Main and 88th streets (R.T. 33, 35).  Guillen dropped

17 Petitioner off as requested (Supp. C.T. 37).  Petitioner said

18 something like "fuck them guys, I'm gonna smoke them" (Supp. C.T. 38).

19 Petitioner had the gun he obtained from Cave's house, and was wearing

20 the two-sided jacket the police later took from Guillen, with the blue

21 side turned out and the gray side turned in (Supp. C.T. 39-40).

22 Guillen said the jacket belonged to Petitioner (Supp. C.T. 40-41).

23

24     Guillen drove away, and heard a couple of shots (Supp. C.T. 41).

25 Petitioner gave the jacket to Guillen approximately three hours after

26 the shooting (Supp. C.T. 47-48).  The next day, Petitioner told

27 Guillen: "Man, I got those fools." (Supp. C.T. 42).

28 ///

**Trial Testimony of Marvin Guillen**

Marvin Guillen testified as follows:

Marvin Guillen and Petitioner were members of a clique of the 18th Street gang (R.T. 124).  The blue car Guillen drove belonged to Guillen's mother (R.T. 68, 125).  Asked if he recognized a photograph of the white van, Guillen said he did not remember (R.T. 125).

Guillen essentially denied recalling anything concerning the incident.  Guillen said he did not recall talking to police regarding the case (R.T. 133).  Guillen did not recall being pulled over by police with Petitioner, Rojas and Fernandez in the Cadillac (R.T. 130).  Guillen did not recall running into a couple of guys at a liquor store and telling them he was from 18th Street (R.T. 127).  Guillen did not recall seeing Petitioner looking "all beat up," or making fun of Petitioner for getting beat up by some guy earlier that evening (R.T. 128).  Guillen did not recall whether the white van was Petitioner's and said he did not recall how the van had become damaged (R.T. 129).  Guillen did not recall driving around with Petitioner in Guillen's blue Cadillac looking "to smoke" someone, did not recall allowing Petitioner to use Guillen's jacket, did not recall Petitioner picking up a gun to shoot someone, and did not recall Petitioner telling Guillen, later that morning, that Petitioner had "smoked those fools and they're not breathing anymore" (R.T. 126-27).  Guillen said he had never seen Petitioner with a gun (R.T. 131).  Shown the jacket, Guillen said he had never seen it before (R.T. 130).

///

16

1      Guillen also said that he had never snitched on a fellow gang

2   member, and that a member of the 18th Street gang who testified

3   against a fellow gang member could "get killed" (R.T. 131, 135).

4   Asked if he was scared to testify, Guillen replied: "Not really."

5   (R.T. 135).

6

7      Guillen admitted pleading guilty to manslaughter in connection

8   with Medina's death and receiving an eleven-year prison sentence, but

9   said he had nothing to do with the killing (R.T. 133, 134-35, 136).

10  Guillen denied shooting anyone (R.T. 134).

11

12  **Diego Fernandez**

13

14     Diego Fernandez testified as follows:[7]

15

16     Diego, owner of an auto sales company in Los Angeles, sold the

17  white van to Petitioner sometime prior to June of 2002 (R.T. 390).  At

18  the time of the sale, the van was undamaged (R.T. 390).  Diego

19  repossessed the car out of impound sometime after June 22, 2002 (R.T.

20  388, 391).  Shown a photograph of the van, Diego said the damage he

21  observed in the photograph had not been there when he sold the car to

22  Petitioner, but that the damage was there when Diego repossessed the

23  car (R.T. 390).

24  ///

25  ///

26  _____

27     [7]    Nothing in the record indicates that Diego Fernandez
    was related to Freddie Fernandez.  For clarity, the Court refers
28  to Diego Fernandez by his first name.

1 **Other Prosecution Evidence**

2

3     A deputy medical examiner testified that Medina died of a gunshot

4 wound to the "neck chest area" (R.T. 117-19).  A firearms examiner

5 testified that he could not identify or eliminate the .38 or .357

6 coroner's bullet as having been fired from the gun found at

7 Petitioner's residence (R.T. 377-83).  A gang expert opined that the

8 crime was committed for the benefit of a street gang (R.T. 400).

9

10 II.  **Defense Case**

11

12     **Rojelio Perez**

13

14     Rojelio Perez testified as follows:

15

16     Perez, Petitioner's father, testified that, in July of 2002,

17 Petitioner was living with Mr. Perez (R.T. 633).  Mr. Perez said that

18 the .357 magnum the police took from his house on July 17, and the

19 ammunition found in the house, belonged to Mr. Perez (R.T. 633-34).

20 Mr. Perez kept the gun in a locked box to which he had the only key,

21 and Mr. Perez said Petitioner never had access to the gun (R.T. 633-

22 35).

23

24     **Alex Molina**

25

26     Alex Molina testified as follows:

27

28     Alex testified that while he, Medina, Galindo and another man

were at the Felix Bar, someone said Medina had bumped him (R.T. 645-47).  There was a confrontation, but no fight (R.T. 647, 654).  Later, when Alex and his brother were in a liquor store, a man yelled inside that someone was fighting outside (R.T. 647).  Alex walked outside but did not see anything (R.T. 647).  Alex walked across the street to where his brother was running towards a white van (R.T. 647, 655).  The van drove away (R.T. 648).  At a gas station, a car drove up, and the occupants asked Alex's brother where he was from, and said this was 18th Street area (R.T. 648, 655-56, 678).  Shown a photo of Guillen's car, Alex said it looked "very similar" to the car he saw at the liquor store (R.T. 656).  Shown a photo of the van Petitioner testified he drove, Alex said it looked like the white van Alex saw when he came out of the liquor store (R.T. 656-57, 735-36).

Approximately 30 to 45 minutes later, the shooting at Medina's house occurred (R.T. 648).  The same blue car that Alex had seen at the gas station drove by very slowly several times (R.T. 657, 677).  Alex saw a person walking down the middle of the street (R.T. 679-80).  The person was wearing a gray sweater with the hood over his head and blue jeans (R.T. 681-82).  Alex did not recall whether the blue jeans were light or dark, but said the shooter was not wearing tan pants (R.T. 691).  There was a cab behind the shooter with its lights on (R.T. 688).  Alex did not pay much attention until shots were fired (R.T. 680).

That day, Alex gave a description of the shooter as between 5'10" and 6'1" tall and 180 to 190 pounds (R.T. 649).  Alex told police he thought the shooter might have been the man who bumped into Medina

1  outside the bar (R.T. 649).

2

3      **Detective Zambos**

4

5      Detective Zambos testified concerning his interview with Guillen
6  on July 22, 2002 (R.T. 697-99).  Zambos said he took the jacket from
7  Guillen's closet on July 17, but did not arrest Guillen on that date
8  (R.T. 698).

9

10     **George Rojas**

11

12     George Rojas testified as follows:

13

14     About 2:00 a.m. on June 22, 2002, George Rojas, Guillen,
15  Petitioner, Freddie and others were hanging out at 81st and Hoover
16  (R.T. 712).  Guillen drove Rojas over to check on his girlfriend (R.T.
17  710-11, 713).  Petitioner and Freddie Fernandez accompanied Guillen
18  and Rojas in Guillen's Cadillac (R.T. 709-10, 716-17).  Los Angeles
19  police pulled the car over and asked the men to exit (R.T. 710, 716-
20  18).  The police searched the car and the men, asked a few questions,
21  filled out cards, and allowed them to go about their business (R.T.
22  710, 717-18).

23

24     The men decided to go home (R.T. 711).  Freddie was staying at a
25  friend's house on 81st and Broadway, so they took Freddie home first
26  "since he was the closest one" (R.T. 711).  They then dropped
27  Petitioner off at his home on Mariposa and Imperial, approximately a
28  mile from Rojas' house (R.T. 711).  Around 3:00 a.m., Guillen dropped

1  Rojas off and left (R.T. 712, 726-27).  After that, Rojas did not see

2  Guillen for several weeks (R.T. 713).  Rojas said the jacket found in

3  Guillen's car belonged to Guillen (R.T. 775).

4

5      On cross-examination, Rojas admitted that, although he knew the

6  police had tried to contact him, Rojas did not go to the police, and

7  never previously had revealed that Petitioner was dropped off before

8  Rojas (R.T. 721-22).

9

10      **Petitioner**

11

12      Petitioner testified as follows:

13

14      Petitioner was a member of the South Central Los Gangsters clique

15  of the 18th Street gang, and his area was around 81st and Hoover (R.T.

16  730-31).  According to Petitioner, his gang performed "criminal acts"

17  and could rob or kill people (R.T. 754).  Petitioner was on probation

18  on a narcotics conviction at the time of his arrest on the instant

19  charge (R.T. 732).  Petitioner said he always has had a mustache (R.T.

20  745).

21

22      Petitioner grew up with Guillen and had known Guillen for ten

23  years (R.T. 733).  On June 22, 2002, Guillen picked Petitioner and

24  others up at Petitioner's hangout on 81st and Hoover (R.T. 733-34).

25  Petition did not go to a liquor store earlier that day (R.T. 734).

26  Petitioner was wearing tan shoes, tan pants and a white T-shirt (R.T.

27  739).  The police pulled the car over, searched the men and the car,

28  and filled out "F.I.'s" (R.T. 734-35).  Petitioner did not wear any

21

1   blue jeans or dark clothing that night (R.T. 739). Petitioner

2   identified the jacket found in Guillen's car as Guillen's, and denied

3   ever wearing that jacket or wearing blue jeans or dark clothing on the

4   night of the incident (R.T. 734, 739, 748).

5

6        Petitioner did not have a fight with anyone at a liquor store,

7   and denied having any bruises on his face at any time during the month

8   of June (R.T. 739, 749). Petitioner denied ever seeing Medina,

9   Edgardo Perez or Galindo (R.T. 746-47). Petitioner denied saying he

10  was going to "smoke" anyone and denied shooting Medina or anyone on

11  June 22 (R.T. 748, 761, 766). Petitioner denied knowing "Smokey" or

12  "Cave" (R.T. 755). When the effort to have Rojas visit his girlfriend

13  was unsuccessful, the men dropped Freddie off on Broadway, then

14  dropped Petitioner off at home (R.T. 739-41). Petitioner's van was

15  parked across the street from Petitioner's house (R.T. 740).

16  Petitioner did not go out again that night (R.T. 740-41).

17

18        Petitioner next saw Guillen approximately two or three days

19  later, but Guillen did not tell Petitioner anything (R.T. 741).

20  Later, Petitioner accompanied Guillen as Guillen drove around trying

21  to sell his rims and sound system, actions that seemed "unusual" to

22  Petitioner (R.T. 741-42). Guillen told Petitioner that Guillen was

23  going to leave the area (R.T. 742). On July 11, Petitioner and

24  Guillen were pulled over in Petitioner's van, and the van was towed

25  (R.T. 742). Approximately two weeks later, Guillen told Petitioner

26  that the police came to Guillen's house asking questions about

27  Petitioner, and that Petitioner should leave town (R.T. 743).

28  Petitioner thought something was "kind of wrong" with Guillen (R.T.

1  746).  Petitioner told Guillen that Petitioner had nothing to worry

2  about and had nothing to hide (R.T. 743).  After Petitioner was

3  arrested, Petitioner found out that Guillen had implicated Petitioner

4  (R.T. 746).

5

6      On direct examination, Petitioner said the white van was "a

7  little bit" his, but legally it was never in his name (R.T. 735).  On

8  cross-examination Petitioner said the van was his (R.T. 756).

9  Petitioner said that, when the van was impounded, Petitioner would pay

10  Diego Fernandez to get the van out of impound and give it back to

11  Petitioner (R.T. 737-38).  Petitioner was stopped in the van on

12  July 11 and the van was towed (R.T. 736).  According to Petitioner,

13  the van had bullet holes and a dent in the door when Petitioner first

14  got it (R.T. 738).  According to Petitioner, the van was not damaged

15  in any fight at a liquor store on June 22 (R.T. 757).

16

17                    **PETITIONER'S CONTENTIONS**

18

19      Petitioner contends:

20

21      (1) trial counsel's dual representation of Petitioner and another

22  alleged suspect (Freddie Fernandez) assertedly created a conflict of

23  interest which allegedly led counsel to ignore the other suspect and

24  to fail to explore the culpability of that suspect, assertedly in

25  violation of the Sixth Amendment (Petition, Ground One; Traverse,

26  pp. 6-12);

27  ///

28  ///

(2) Petitioner's trial counsel allegedly rendered ineffective assistance, assertedly by failing to present evidence of another purported "look-alike" suspect, i.e., Freddie Fernandez, and assertedly by failing to produce an expert witness to challenge the identifications of Petitioner (Petition, Ground Two; Traverse, pp. 12-19, 24-25); and

(3) Petitioner's trial counsel allegedly rendered ineffective assistance by assertedly failing to develop and present evidence to show: (a) the shooter's alleged lack of a mustache; (b) the alleged fact that the "last person in the gang car" assertedly was Petitioner's "look-alike" and a possible suspect; (c) the alleged fact that the gun found in Petitioner's house assertedly was not the murder weapon; (d) the alleged absence of bruising and swelling on Petitioner's face; and (e) the alleged fact that the color of the shooter's pants did not match the color of Petitioner's pants (Petition, Ground Three; Traverse, pp. 19-23, 25-26).

**STANDARD OF REVIEW**

A federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

1  presented in the State court proceeding." 28 U.S.C. § 2254(d) (as

2  amended); see also Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002);

3  Early v. Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S.

4  362, 405-09 (2000).

5

6      "Clearly established Federal law" refers to the governing legal

7  principle or principles set forth by the Supreme Court at the time the

8  state court renders its decision.  Lockyer v. Andrade, 538 U.S. 63

9  (2003).  A state court's decision is "contrary to" clearly established

10 Federal law if: (1) it applies a rule that contradicts governing

11 Supreme Court law; or (2) it "confronts a set of facts. . . materially

12 indistinguishable" from a decision of the Supreme Court but reaches a

13 different result.  See Early v. Packer, 537 U.S. at 8 (citation

14 omitted); Williams v. Taylor, 529 U.S. at 405-06.

15

16     Under the "unreasonable application prong" of section 2254(d)(1),

17 a federal court may grant habeas relief "based on the application of a

18 governing legal principle to a set of facts different from those of

19 the case in which the principle was announced."  Lockyer v. Andrade,

20 538 U.S. at 76 (citation omitted); see also Woodford v. Visciotti, 537

21 U.S. at 24-26 (state court decision "involves an unreasonable

22 application" of clearly established federal law if it identifies the

23 correct governing Supreme Court law but unreasonably applies the law

24 to the facts).

25

26     A state court's decision "involves an unreasonable application of

27 [Supreme Court] precedent if the state court either unreasonably

28 extends a legal principle from [Supreme Court] precedent to a new

25

context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply." Williams v. Taylor, 529 U.S. at 407 (citation omitted).

"In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" Id. at 520-21 (citation omitted); see also Clark v. Murphy, 331 F.3d 1062, 1068 (9th Cir.), cert. denied, 540 U.S. 968 (2003).

In applying these standards, this Court looks to the last reasoned state court decision. See Franklin v. Johnson, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002). Where no such reasoned opinion exists, as where a state court rejected a claim in an unreasoned order, this Court must conduct an independent review to determine whether the decisions were contrary to, or involved an unreasonable application of, "clearly established" Supreme Court precedent. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

///
///
///
///
///
///
///
///

1            **DISCUSSION**

2

3        For the reasons discussed below, the Petition should be denied

4    and dismissed with prejudice.[8]

5

6    I.   **Petitioner Is Not Entitled to Habeas Relief on Ground One of the**

7         **Petition.**

8

9        A.    **Background**

10

11       Prior to the incident on June 21-22, 2002, Freddie Fernandez was

12   a defendant in two separate state court criminal proceedings, in

13   People v. Fernandez, Los Angeles Superior Court case number 1CR05716,

14   and People v. Fernandez, Los Angeles County Superior Court case number

15   _____

16       [8]    In the Answer, Respondent contends the Petition is
     conclusory.  While the Petition is not a model of clarity, and
17   its allegations are sparse, the Traverse sufficiently identifies
     Petitioner's claims and the alleged factual support therefor.
18   However, in the Traverse, Petitioner purports to rely on all
     documents lodged herein by Respondent, suggesting that the Court
19   sift through all of Petitioner's state court petitions in an
     effort to identify the "relevant facts and arguments in support
20   of [Petitioner's] claims" (Traverse, p. 6, n.1).  The Court
     declines Petitioner's invitation to augment the claims set forth
21   in the Petition and Traverse via an undirected search through
     hundreds of pages of state court filings.  Cf. Forsberg v.
22   Pacific N.W. Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988)
     ("[t]he district judge is not required to comb the record to find
23   some reason to deny a motion for summary judgment"); cf. also
     Independent Towers of Washington v. Washington, 350 F.3d 925, 929
24   (9th Cir. 2003) ("'[j]udges are not like pigs, hunting for
     truffles buried in briefs'") (quoting United States v. Dunkel,
25   927 F.2d 955, 956 (7th Cir. 1991)).  The Court generally has
     limited its analysis to the claims, arguments and allegations
26   contained in the Petition and the Traverse, except insofar as
     those documents make express reference to a particular state
27   court document.

28

                                  27

1  BA227514 (see Traverse, pp. 9-10 n.3, referencing Respondent's

2  Lodgment 13:2, Exs. M, N, O).  In case number 1CR05716, a misdemeanor

3  case, the prosecution filed a complaint on February 27, 2001, charging

4  Fernandez with two counts of unlawful obstruction of a peace officer

5  and one count of public intoxication (Respondent's Lodgment 13:2,

6  Ex. M, p. 108).  Fernandez pled guilty to one of the charges and was

7  placed on summary probation (Respondent's Lodgment 13:2, Ex. M.,

8  pp. 108-09).  The case subsequently was called for progress reports

9  and other proceedings in 2001 (Respondent's Lodgment 13:2, Ex. M.,

10  pp. 109-111).  On February 22, 2002, the case was called for a

11  possible probation violation (Respondent's Lodgment 13:2, Ex. M.,

12  p. 111).  Attorney William McKinney appeared on Fernandez' behalf as

13  private counsel (Respondent's Lodgment 13:2, Ex. M., p. 111).  On

14  May 23, 2002, the court trailed case number 1CR05716 to case number

15  BA227514 (Respondent's Lodgment 13:2, Ex. M, p. 112).  The case

16  continued to trail until October 25, 2002, when the court ordered

17  probation reinstated in light of the dismissal of case number BA227514

18  pursuant to California Penal Code section 1385, which authorizes a

19  court to dismiss a case in the interest of justice (Respondent's

20  Lodgment 13:2, Ex. M, pp. 112-16).

21

22      The record does not contain much information concerning case

23  number BA227514.  According to Petitioner, in case number BA227514,

24  Fernandez was charged with pimping and with two counts of sex with a

25  minor under the age of 16 (Traverse, p. 9).  At Fernandez' preliminary

26  hearing on May 17, 2002, Los Angeles Police Officer Adam Futami

27  testified as the investigating officer (Respondent's Lodgment 13:2,

28

1  Ex. O, p. 131).[9]  Futami testified that he spoke with Danielle S., a

2  minor, on August 8, 2001, who related that Fernandez had had sex with

3  her twice when she was 15 (Respondent's Lodgment 13:2, Ex. O, p. 132-

4  37).  Futami said Danielle told him that she and Fernandez established

5  a "business relationship" whereby Fernandez paid Danielle to have sex

6  with men (Respondent's Lodgment 13:2, Ex. O, pp. 137-41).  Futami

7  testified that Danielle related that either Fernandez or a person

8  named Roy Perez would drop Danielle and her friend Ashly off at a

9  location where the girls would perform acts of prostitution

10  (Respondent's Lodgment 13:2, Ex. O, pp. 140).  According to Futami,

11  Danielle stayed at Fernandez' apartment at 81st and Hoover and had sex

12  with Fernandez at that location (Respondent's Lodgment 13:2, Ex. O,

13  pp. 142).  Mr. McKinney presented no affirmative defense, but moved to

14  dismiss on the ground that the evidence was insufficient to show

15  Fernandez knew the victim was 15 (Respondent's Lodgment O, pp. 149-

16  50).  The court held Fernandez to answer (Respondent's Lodgment 13:2,

17  Ex. O, p. 150).

18

19      In Petitioner's case, the crime with which Petitioner was charged

20  occurred on June 22, 2002, while Fernandez' case number 1CR05716 was

21  trailing, and over a month after the preliminary hearing in Fernandez'

22  case number BA227514 at which Officer Futami testified.  On August 21,

23  2002, Mr. McKinney represented Petitioner at the preliminary hearing

24

25      [9]    Although Petitioner contends that the preliminary
26  hearing in case number BA227514 occurred on July 17, 2002 (see
   Traverse, p. 10), the preliminary hearing transcript which
27  Petitioner references shows that the preliminary hearing in case
   number BA227514 occurred on May 17, 2002 (Respondent's Lodgment
28  13:2, Ex. O).

1 (C.T. 1).   The record does not show any earlier representation of

2 Petitioner by Mr. McKinney.   At the preliminary hearing on August 21,

3 2002, the prosecution called Officer Futami to testify as a gang

4 expert (C.T. 36-37).[10]   The court held Petitioner to answer (C.T. 50-

5 51).   Mr. McKinney represented Petitioner at arraignment on

6 September 4, 2002 and thereafter (see C.T. 55).   As indicated

7 previously, the court dismissed case number BA227514 in the interest

8 of justice on October 25, 2002.

9

10       Thus, the record shows that during the approximately three-month

11 period from August 21, 2002 (the date of Petitioner's preliminary

12 hearing) to October 25, 2002 (the date the charges against Fernandez

13 were resolved), Mr. McKinney represented both Fernandez and

14 Petitioner.   The record shows that the pretrial proceedings in

15 Petitioner's case during this time period consisted of:

16 (1) Petitioner's arraignment on September 4, 2002; and (2) a pretrial

17 conference on September 26, 2002 (C.T. 55-56).[11]

18

19       **B.**   **Discussion**

20

21       To succeed on his conflict of interest claim, Petitioner must

22 show that an actual conflict of interest adversely affected his

23 lawyer's performance.   Mickens v. Taylor, 535 U.S. 162, 171 (2002);

24 Cuyler v. Sullivan, 446 U.S. 335, 348-50 (1980); Hovey v. Ayers, 458

25 _____

26       [10]   Officer Futami did not testify at Petitioner's trial.

27       [11]   In Petitioner's case, the jury was selected and sworn
on December 11, 2002, and opening statements occurred the next
28 day, December 12, 2002 (C.T. 60-62).

30

1  F.3d 892, 907-08 (9th Cir. 2006).  An actual conflict of interest is

2  one "that affected counsel's performance -- as opposed to a mere

3  theoretical division of loyalties."  Mickens v. Taylor, 535 U.S. at

4  171.  An adverse effect is "one that significantly worsens counsel's

5  representation of the client . . . ."  United States v. Mett, 65 F.3d

6  1531, 1536 (9th Cir. 1995), cert. denied, 519 U.S. 870 (1996).

7

8      The mere fact of dual representation by an attorney does not

9  create a per se conflict of interest.  Alberni v. McDaniel, 458 F.3d

10  860, 870 (9th Cir. 2006), cert. denied, 127 S. Ct. 1834 (2007).  Even

11  assuming, arguendo, a potential conflict of interest existed in

12  Petitioner's case, Petitioner must show that the potential conflict

13  "ripened into an actual conflict" by showing the conflict was the

14  cause of an adverse effect on counsel's performance.  See Belmontes v.

15  Brown, 414 F.3d 1094, 1119 (9th Cir. 2005), rev'd on other grounds,

16  549 U.S. 7 (2006).  "A link between deficient performance and the

17  conflict of interest must be shown."  Alberni v. McDaniel, 458 F.3d at

18  872 (citations omitted).

19

20      To show the requisite adverse effect, Petitioner must prove that

21  "counsel was influenced in his basic strategic decisions by the

22  interests of [the former client]. . . ."  United States v. Shwayder,

23  312 F.3d 1109, 1118 (9th Cir. 2002), amended, 320 F.3d 889 (9th Cir.),

24  cert. denied, 540 U.S. 826 (2003) (citation and internal quotations

25  omitted; original brackets).  Petitioner must show that "some

26  plausible alternative defense strategy or tactic might have been

27  pursued but was not and that the alternative defense was inherently in

28  conflict with or not undertaken due to the attorney's other loyalties

31

1   or interests." <u>United States v. Wells</u>, 394 F.3d 725, 733 (9th Cir.

2   2005) (citation and internal quotations omitted); <u>see also</u> <u>United</u>

3   <u>States v. Rodrigues</u>, 347 F.3d 818, 824 (9th Cir. 2003) (to warrant

4   evidentiary hearing on conflict of interest claim, petitioner must

5   allege specific facts which, if true, would indicate that:

6   (1) counsel's relationship to a third party influenced counsel not to

7   pursue a "particular litigation strategy"; and (2) "the foregone

8   litigation strategy would have been a viable alternative").

9

10       Petitioner contends that Fernandez was "very likely the actual

11   shooter" (Traverse, p. 7).  According to Petitioner, Fernandez was "in

12   a position of authority in the gang" because Fernandez assertedly was

13   sitting in the front passenger seat when the Cadillac was stopped

14   (Traverse, p. 7).  Petitioner contends that "[w]ithin the gang

15   structure it is known that the person with the higher pecking order,

16   within the gang, is going to ride in front" (Traverse, p. 8).

17   Petitioner also alleges that Fernandez was the last person in

18   Guillen's Cadillac, and that the field identification card incorrectly

19   listed Fernandez' address as a Los Angeles address, when it actually

20   was a Pasadena address (Traverse, p. 8).[12]  Petitioner further

21   contends that the photo six-packs show that Guillen and Rojas "look

22   extremely different than [sic] Petitioner," and that the photos of

23   Fernandez and Petitioner assertedly appear to be very similar

24

25

26   ───────────────

27       [12]    As previously indicated, Officer Kouri testified that,
     when Kouri encountered Guillen at about 6:00 a.m. on the morning
     after the murder, Guillen told Kouri that Guillen had just
28   dropped off one of the persons in the car in Pasadena (R.T. 352).

1   (Traverse, pp. 8-9).[13]  Petitioner contends Mr. McKinney did not use

2   this information implicating Fernandez because the information

3   assertedly would have placed Fernandez, Mr. McKinney's alleged other

4   client, in jeopardy (Traverse, p. 9).[14]  Petitioner generally contends

5   Mr. McKinney allegedly "knew that Petitioner was innocent, but did

6   nothing to show that Fernandez was culpable" (Traverse, pp. 11-12).

7

8        The record shows that Mr. McKinney contemplated calling both

9   Fernandez and Rojas as defense witnesses (R.T. 601).  The prosecution

10  suggested that, because both men assertedly were in the car when

11  "Mr. Guillen was driving by with the defendant," the court should

12  appoint counsel for the two witnesses (R.T. 601-02).  The court

13  indicated that the prosecutor might be right, and said the court would

14  have someone from the public defender's office speak with Fernandez

15  (R.T. 602-03).

16

17       Later, Mr. McKinney indicated he had decided not to call

18  Fernandez (R.T. 672).  Mr. McKinney told the court:

19  _____

20       [13]  The six-packs containing the photographs of Guillen and
     Rojas are not in the present record.

21
         [14]  Petitioner also alleges that Fernandez was prosecuted
22  on a charge of using a semiautomatic weapon to shoot at an
     inhabited dwelling or vehicle subsequent to Petitioner's trial
23  (Traverse, p. 11).  Petitioner references an exhibit to his
     California Supreme Court habeas petition showing that Fernandez
24  was arraigned in this matter on November 16, 2004 (Traverse,
     p. 11, n.6, citing Respondent's Lodgment 13:2, Ex. N).  This was
25  two months after the Court of Appeal issued its decision
     affirming the judgment in Petitioner's case on September 16, 2004
26  (see Respondent's Lodgment 6).  Mr. McKinney did not represent
     Petitioner on appeal (see Respondent's Lodgments 4, 6).
27  Fernandez' 2004 prosecution plainly could not have influenced
     Mr. McKinney's representation of Petitioner in 2002.
28

1    I've talked to Mr. Fernandez, and he indicates that he was

2    dropped off in the vehicle first, and was -- and the

3    defendant -- my client was still in the vehicle when he was

4    dropped off.  So I think that Mr. Rojas would be the witness

5    that I would need.  Because I anticipate that Mr. Rojas will

6    testify that my client was dropped off at home second.

7

8  (R.T. 672).  As indicated above, Rojas testified that Fernandez was

9  staying at a friend's house on 81st and Broadway, so Guillen first

10 took Freddie home "since he [Fernandez] was the closest one," and then

11 dropped Petitioner off (R.T. 711).  Petitioner also testified Guillen

12 dropped Fernandez off first and then Petitioner (R.T. 739-41).

13

14    Petitioner has failed to show any actual conflict of interest

15 having an adverse effect on Mr. McKinney's performance as Petitioner's

16 counsel.  Petitioner does not allege that Mr. McKinney obtained any

17 particular confidential information from Fernandez which would have

18 been favorable to Petitioner.  At trial, Mr. McKinney presented a

19 defense of misidentification, and argued that Guillen, not Fernandez,

20 was the actual shooter (see R.T. 879).  In light of the evidence, and

21 regardless of any purported resemblance between Petitioner and

22 Fernandez, Mr. McKinney's argument represented a reasonable tactical

23 choice.  Guillen pled guilty to manslaughter in connection with the

24 case.  Indeed, the jury was informed that Guillen was an accomplice as

25 a matter of law (R.T. 789; C.T. 100).  Both defense witness Rojas and

26 Petitioner himself testified that Fernandez was dropped off before

27

28

34

1  Petitioner (R.T. 711, 739-40).[15]  Petitioner himself suggested that

2  Guillen (not Fernandez) was acting in an "unusual" manner, like

3  "something was wrong" after the shooting (R.T. 746).  Petitioner never

4  once intimated in his trial testimony that Fernandez was the shooter.

5

6       Petitioner's speculation that Fernandez' reported location in the

7  car showed Fernandez held a position of power in a gang does not

8  suffice to show a conflict of interest adversely affecting counsel's

9  performance.  See United States v. Wells, 394 F.3d at 735 (speculation

10  concerning counsel's alleged failings unsupported by evidence is

11  insufficient); see also United States v. DeCologero, ___ F.3d ___,

12  2008 WL 2486503 (1st Cir. June 23, 2008) ("[s]howing an adverse effect

13  . . . requires more than mere speculation") (citation omitted).  In

14  any event, Fernandez' alleged position of power in a gang did not show

15  Fernandez was the shooter.  Petitioner's suggestion that Fernandez

16  could have killed Medina because of some unidentified connection

17  between Medina and Fernandez' alleged criminal activities is sheer

18  speculation unsupported by any facts.  Such allegations are wholly

19  insufficient to show an actual conflict of interest adversely

20  affecting counsel's performance.  See United States v. Wells, 394 F.3d

21  at 735.  In sum, Petitioner has not met his burden to show that any

22  actual conflict of interest worsened Mr. McKinney's representation of

23  Petitioner or caused Mr. McKinney to forgo a viable litigation

24  strategy.  See id. at 733; United States v. Rodrigues, 347 F.3d at

25  824; see also Bragg v. Galaza, 242 F.3d 1082, 1086-87 (9th Cir.),

26  amended, 253 F.3d 1150 (9th Cir. 2001) (rejecting conflict of interest

27  _____

28       [15]    According to defense witness Rojas, Fernandez was not
    living in Pasadena on the night of the incident (R.T. 711).

1  claim in murder prosecution, where counsel represented petitioner, who

2  was charged with being the driver of a car from which shots were

3  fired, and also represented, in an unrelated case, an individual whom

4  a witness subsequently identified as being a passenger in the car;

5  although counsel at trial did not argue the passenger was the shooter,

6  petitioner failed to show that any conflict had caused counsel's

7  actions or inactions, and counsel could have had valid tactical

8  reasons for failing to pursue the strategy suggested by petitioner).

9

10      In sum, the state courts' rejection of Petitioner's conflict of

11  interest claim was not contrary to, or an objectively unreasonable

12  application of, any clearly established Federal law as determined by

13  the United States Supreme Court.  <u>See</u> 28 U.S.C. § 2254(d).  Petitioner

14  is not entitled to habeas relief on Ground One of the Petition.

15

16  II.  <u>**Petitioner Is Not Entitled to Habeas Relief on Ground Two of the**</u>

17       <u>**Petition.**</u>

18

19       A.  <u>**Governing Legal Standards**</u>

20

21      To establish ineffective assistance of counsel, Petitioner must

22  prove: (1) counsel's representation fell below an objective standard

23  of reasonableness; and (2) there is a reasonable probability that, but

24  for counsel's errors, the result of the proceeding would have been

25  different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694, 697

26  (1984) ("<u>Strickland</u>").  A reasonable probability of a different result

27  "is a probability sufficient to undermine confidence in the outcome."

28  <u>Id.</u> at 694.  The court may reject the claim upon finding either that

1  counsel's performance was reasonable or the claimed error was not

2  prejudicial.  Id. at 697; Rios v. Rocha, 299 F.3d 796, 805 (9th Cir.

3  2002) ("Failure to satisfy either prong of the Strickland test

4  obviates the need to consider the other.") (citation omitted).  For

5  purposes of habeas review under 28 U.S.C. section 2254(d), Strickland

6  sets forth clearly established Federal law as determined by the United

7  States Supreme Court.  See Williams v. Taylor, 529 U.S. at 391

8  (citation and quotations omitted).

9

10      Review of counsel's performance is "highly deferential" and there

11  is a "strong presumption" that counsel rendered adequate assistance

12  and exercised reasonable professional judgment.  Williams v. Woodford,

13  384 F.3d 567, 610 (9th Cir. 2004), cert. denied, 546 U.S. 934 (2005)

14  (quoting Strickland, 466 U.S. at 689).  The court must judge the

15  reasonableness of counsel's conduct "on the facts of the particular

16  case, viewed as of the time of counsel's conduct."  Strickland, 466

17  U.S. at 690.  The court may "neither second-guess counsel's decisions,

18  nor apply the fabled twenty-twenty vision of hindsight."  Karis v.

19  Calderon, 283 F.3d 1117, 1130 (9th Cir. 2002), cert. denied, 539 U.S.

20  958 (2003) (citation and quotations omitted); see Yarborough v.

21  Gentry, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees

22  reasonable competence, not perfect advocacy judged with the benefit of

23  hindsight.") (citations omitted).  The test is "only whether some

24  reasonable lawyer . . . could have acted, in the circumstances, as

25  defense counsel acted."  Coleman v. Calderon, 150 F.3d 1105, 1113 (9th

26  Cir.) (citations and quotations omitted), rev'd on other grounds, 525

27  U.S. 141 (1998); see also Babbitt v. Calderon, 151 F.3d 1170, 1173-74

28  (9th Cir. 1998), cert. denied, 525 U.S. 1159 (1999) (relevant inquiry

1  under <u>Strickland</u> is not what defense counsel could have pursued, but

2  rather whether the choices made by defense counsel were reasonable)

3  (citation and quotations omitted); <u>Morris v. California</u>, 966 F.2d 448,

4  456-57 (9th Cir.), <u>cert. denied</u>, 506 U.S. 831 (1992) (if the court can

5  conceive of a reasonable tactical reason for counsel's action or

6  inaction, the court need not determine the actual explanation).

7  Petitioner bears the burden to "overcome the presumption that, under

8  the circumstances, the challenged action might be considered sound

9  trial strategy." <u>Strickland</u>, 466 U.S. at 689 (citation and quotations

10 omitted).[16]

11 ///

12 ///

13 ///

14 ///

15 ///

16 ///

17 ///

18 _____

19   [16]   The Court rejects Petitioner's contention that the
    "presumed prejudice" rule of <u>United States v. Cronic</u>, 466 U.S.
20  648 (1984), applies to Petitioner's claims of ineffective
    assistance of counsel. <u>See</u> <u>Bell v. Cone</u>, 535 U.S. 685, 697-98
21  (2002) (<u>Cronic</u> applies only where counsel completely fails to
    subject prosecution's case to meaningful adversarial testing, not
22  where counsel's alleged failure to do so occurs only at specific
    points during trial; claims that counsel failed to submit
23  mitigating evidence and waived closing argument analyzed under
    <u>Strickland</u> standard); <u>Richter v. Hickman</u>, 521 F.3d 1222, 1236
24  (9th Cir. 2008) (<u>Cronic</u> inapplicable to claim that counsel failed
25  to investigate and prepare for trial, where record showed counsel
    engaged in adversarial testing during trial, including making
26  motions and cross-examining witnesses); <u>Hovey v. Ayers</u>, 458 F.3d
27  at 906-07 ("<u>Cronic</u> requires wholesale failure by counsel to
    defend the client"; <u>Strickland</u> standard applied to claim that
28  counsel made prejudicial concessions in closing argument).

38

B.     **Discussion**

1.     **Alleged Failure to Present Evidence of Another**
        **Purported "Look-Alike" Suspect**

Petitioner contends his counsel ineffectively failed to present evidence of "another 'look-alike' suspect," i.e., Fernandez (Traverse, pp. 12-13).  Petitioner contends that counsel should have introduced evidence of asserted physical similarities shared by Petitioner and Fernandez, along with alleged evidence of Fernandez' violent nature, Fernandez' alleged criminal background, and Fernandez' alleged prostitution activities (Traverse, pp. 13-14).

This claim lacks merit.  The prosecution introduced into evidence the six-pack containing Petitioner's photograph and the six-pack containing Fernandez' photograph (R.T. 421-22, 666).  Consequently, the jury had evidence of the alleged physical similarities between the two.  Petitioner has made no showing that his counsel had any reason to know of Fernandez' allegedly "violent nature" at the time of Petitioner's trial.  The charges in Fernandez' two state court criminal cases prosecuted prior to or at the time of Petitioner's criminal proceedings were not violent.  As indicated above, Fernandez was charged in 2004 with shooting a semiautomatic weapon, but that charge occurred after the conclusion of Petitioner's trial and appeal.  Petitioner's speculation that Fernandez' alleged "prostitution activity" assertedly might have motivated Fernandez to shoot Medina lacks any factual support.  Further, Petitioner has failed to demonstrate that his counsel had any reason to entertain the

39

speculative and seemingly improbable theory that Fernandez' alleged "prostitution activity" had anything to do with Medina's murder.  Such speculation is insufficient to show a Strickland violation.  See Cooks v. Spaulding, 660 F.2d 738, 740 (9th Cir. 1981), cert. denied, 455 U.S. 1026 (1982) (speculation insufficient to show Strickland violation); see also Zettlemoyer v. Fulcomer, 923 F.2d 284, 298 (3d Cir.), cert. denied, 502 U.S. 902 (1991) (petitioner cannot satisfy Strickland standard by "vague and conclusory allegations that some unspecified and speculative testimony might have established his defense").

## 2.   Failure to Call an Eyewitness Identification Expert

In general, an attorney's decision not to call a witness constitutes a matter of trial tactics which this Court should not second-guess.  United States v. Harden, 846 F.2d 1229, 1232 (9th Cir.), cert. denied, 488 U.S. 910 (1988); see also Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005), cert. denied, 546 U.S. 1184 (2006) ("Courts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury.  The decision not to call a particular witness is typically a question of trial strategy that reviewing courts are ill-suited to second-guess.") (citation, internal quotations and brackets omitted); Williams v. Carter, 76 F.3d 199, 200 (8th Cir. 1996) ("The decision whether to call witnesses is normally a judgment by counsel which the courts do not second-guess.") (citation omitted); Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1994) (counsel's decision not to call a particular witness generally is "within the realm of trial strategy");

1 United States v. Long, 674 F.2d 848, 855 (11th Cir. 1982) ("This court

2 will not second-guess tactical decisions of counsel in deciding

3 whether to call certain witnesses"). Furthermore, eyewitness

4 identification expert testimony "is strongly disfavored by most

5 courts." United States v. Labansat, 94 F.3d 527, 530 (9th Cir. 1996),

6 cert. denied, 519 U.S. 1140 (1997) (citation and internal quotations

7 omitted). "Any weaknesses in eyewitness identification testimony can

8 ordinarily be revealed by counsel's careful cross-examination of the

9 eyewitness." Id. (citation and internal quotations omitted).

10

11     Here, a reasonable attorney could have decided not to retain or

12 present an expert on eyewitness identification, reasoning that such

13 testimony would be unnecessary, disfavored and/or excluded. See

14 People v. Sanders, 11 Cal.4th 475, 508, 46 Cal. Rptr. 2d 751, 905 P.2d

15 420 (1995), cert. denied, 519 U.S. 838 (1996) (trial court did not

16 abuse its discretion in excluding expert testimony on eyewitness

17 identification, where: (1) three eyewitnesses positively identified

18 defendant in lineups and at trial and a fourth was "pretty certain";

19 (2) two of the eyewitnesses were the same race as the gunmen; and

20 (3) identifications were corroborated by other evidence, including

21 evidence that defendant asked another person for help in "taking down"

22 the restaurant that was the site of the robbery and murders).

23

24     Moreover, and in any event, Petitioner has not shown a reasonable

25 probability of a different result had counsel called an eyewitness

26 identification expert. At trial, Petitioner's counsel elicited

27 testimony concerning the reliability of the identifications of

28 Petitioner as the shooter. Petitioner's counsel elicited Edgardo's

1  testimony that: (1) on the night of the incident Edgardo had been

2  drinking for several hours and had drunk approximately ten beers;

3  (2) the street lights were on the other side of the street from the

4  side on which Edgardo saw the shooter walking; and (3) the shooter did

5  not have a facial tattoo or a mustache (R.T. 92, 95, 96, 98).   Counsel

6  examined Edgardo about his statement to police that the shooter was

7  5'8" tall and 150 pounds, asking Edgardo which persons in the six-pack

8  containing Petitioner's photograph appeared to fit that description,

9  and even causing Petitioner to stand so that Edgardo could gauge

10  Petitioner's height (R.T. 96, 101, 103-05).   Counsel elicited

11  Galindo's testimony that: (1) Galindo had had approximately seven

12  drinks before he went to the liquor store and had two or three beers

13  at Medina's house; (2) Galindo and his companions were drinking more

14  than Medina; and (3) Galindo purchased four twelve-packs at the liquor

15  store (R.T. 305, 311).   Counsel elicited Detective Zambos' testimony

16  that the field identification card filled out for Petitioner on the

17  night of the incident recorded that Petitioner was wearing a white T-

18  shirt and tan pants, and that Guillen's field identification card

19  indicated Guillen was wearing blue jeans and a blue shirt (R.T. 615-

20  16).   Counsel elicited Alex Molina's testimony that: (1) Alex, Galindo

21  and Edgardo were intoxicated on the night of the incident; (2) the

22  shooter's pants were blue, not tan; and (3) the shooter's hood came

23  forward on the head (R.T. 688, 691-92).   Counsel elicited the medical

24  examiner's testimony that Medina's blood alcohol level was more than

25  twice the legal limit for driving (R.T. 120).   Counsel argued in

26  closing that: (1) Petitioner assertedly had facial hair and was

27  wearing tan pants and a white T-shirt on the night of the incident,

28  contrary to descriptions of the shooter; (2) the witnesses assertedly

42

1  had been drinking, and Medina, who allegedly drank less, assertedly

2  had a blood alcohol level more than double the legal limit; and

3  (3) Petitioner assertedly was not wearing the clothing witnesses

4  described the shooter as wearing, but Guillen allegedly was (R.T. 856-

5  58, 861-62, 864, 866, 877-79).

6

7       Additionally, the court gave California's standard eyewitness

8  testimony instruction, CALJIC 2.92, regarding the factors to consider

9  in proving identity by eyewitness testimony, including: (1) the

10 opportunity of the witness to view the crime and the perpetrator;

11 (2) the stress, if any, to which the witness was subjected at the time

12 of the observation; (3) the witness' ability to provide a description

13 of the perpetrator; (4) the extent to which the defendant fit the

14 witness' description; (5) the witness' capacity to make an

15 identification; (6) whether the witness was able to identify the

16 perpetrator in a photographic or physical lineup; (7) the period of

17 time between the crime and the witness identification; (8) whether the

18 witness had prior contacts with the perpetrator; (9) the extent of the

19 witness' certainty of the identification; (10) whether the

20 identification was in fact the product of the witness' recollection;

21 and (11) any other evidence relating to the witness' ability to make

22 an identification (R.T. 787-88; C.T. 95-96).

23

24      Under these circumstances, the jury sufficiently was able to

25 assess the reliability of the identifications without testimony from

26 an eyewitness identification expert.  See United States v. Labansat,

27 94 F.3d at 530 (counsel's failure to call eyewitness identification

28 expert not ineffective or prejudicial, where counsel could have

1  explored asserted unreliability of delayed identifications through

2  cross-examination and closing argument, and other evidence linked

3  defendant to crime); Alvarez v. Almager, 2007 WL 2330297, at *5 (S.D.

4  Cal. Aug. 10, 2007) (counsel's failure to call eyewitness

5  identification expert not prejudicial, where jury was instructed how

6  to consider and weigh eyewitness testimony); Brown v. Terhune, 158 F.

7  Supp. 2d 1050, 1071 (N.D. Cal. 2001), aff'd, 59 Fed. App'x 190 (9th

8  Cir. 2003) (counsel not ineffective in failing to call eyewitness

9  identification expert, where counsel cross-examined witnesses

10  concerning identifications and emphasized alleged problems with

11  identifications in closing).  Therefore, Petitioner has not shown a

12  reasonable probability of a different result had counsel called an

13  eyewitness identification expert.

14

15          3.   **Conclusion**

16

17      In sum, the state courts' rejection of the Strickland claims

18  alleged in Ground Two of the Petition was not contrary to, or an

19  objectively unreasonable application of, any clearly established

20  Federal law as determined by the United States Supreme Court.  See

21  28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief on

22  Ground Two of the Petition.

23

24  III. **Petitioner Is Not Entitled to Habeas Relief on Ground Three of**

25       **the Petition.**

26

27      In Ground Three, Petitioner contends his trial counsel allegedly

28  rendered ineffective assistance by assertedly failing adequately to

1  develop and present evidence concerning: (1) the shooter's alleged

2  lack of a mustache; (2) the alleged fact that the "last person in the

3  gang car" assertedly was Petitioner's "look-alike" and a possible

4  suspect; (3) the alleged fact that the gun found in Petitioner's house

5  assertedly was not the murder weapon; (4) the alleged absence of

6  bruising and swelling on Petitioner's face; and (5) the alleged fact

7  that the color of the shooter's pants did not match the color of

8  Petitioner's pants (Petition, Ground Three; Traverse, pp. 19-23, 25-

9  26).  As discussed below, many of Petitioner's contentions that

10  counsel failed to develop this evidence simply misrepresent the

11  record.  Moreover, and in any event, under the applicable <u>Strickland</u>

12  standards, all of these claims lack merit.[17]

13

14       A.   <u>**The Shooter's Alleged Lack of a Mustache**</u>

15

16       The record belies Petitioner's contention that trial counsel

17  failed to develop evidence to show that, while Petitioner allegedly

18  had a mustache, the shooter assertedly lacked a mustache.  On cross-

19  examination of Edgardo Perez, Petitioner's counsel elicited testimony

20  that the shooter assertedly had no facial hair (R.T. 96).

21  Petitioner's counsel elicited from Galindo testimony that Galindo did

22  not recall whether the person walking down the middle of the street,

23  whom Galindo identified unequivocally as Petitioner, had facial hair

24  (R.T. 314).  On direct examination of Detective Zambos, Petitioner's

25  ————————————————

26       [17]   The "presumed prejudice" rule of <u>United States v.</u>
   <u>Cronic</u>, 466 U.S. 648 (1984), also does not apply to the claims
27  alleged in Ground Three.  <u>See</u> <u>Bell v. Cone</u>, 535 U.S. at 697-98;
   <u>Richter v. Hickman</u>, 521 F.3d at 1236; <u>Hovey v. Ayers</u>, 458 F.3d at
28  906-07.

1  counsel elicited Zambos' testimony that, at the time of Petitioner's

2  arrest on July 17, 2002, Petitioner had a mustache (R.T. 624).

3  Petitioner's counsel elicited Petitioner's testimony that Petitioner

4  had always had a mustache (R.T. 745).  In closing, counsel mentioned

5  Edgardo's statement that the shooter did not have facial hair, and

6  invited the jury to consider that Petitioner had facial hair (R.T.

7  856-57).  Accordingly, Petitioner has not shown that counsel

8  ineffectively failed to develop evidence that Petitioner allegedly had

9  a mustache on the night of the crime and that the shooter allegedly

10  did not.

11

12      **B.**      **Alleged Evidence Concerning a Possible Suspect Who**

13              **Assertedly Was Petitioner's "Look-Alike"**

14

15      Petitioner contends his counsel failed to develop evidence that

16  "the last person in the gang car[] who was taken to Pasadena **was a**

17  **look alike** of petitioner and should have been considered a suspect"

18  (Traverse, p. 14; original emphasis).  The Traverse clarifies that

19  Petitioner contends counsel should have introduced evidence that

20  Fernandez was the shooter (Traverse, p. 23).  According to Petitioner,

21  Fernandez assertedly was wearing dark-colored pants which corresponded

22  with eyewitness' descriptions of the pants assertedly worn by the

23  shooter (Traverse, p. 23).[18]  Petitioner also contends Fernandez was

24  engaged in criminal activity which involved possession of guns,

25  pimping and sex with underage girls, which Petitioner asserts "likely

26  _____

27      [18]    Fernandez' field identification card recorded that
    Fernandez wore "blu" pants and a white T-shirt (Respondent's
28  Lodgment 13:2, Ex. K, p. 105).

1   was the reason for this shooting" (Traverse, p. 23).

2

3   This claim fails for the reasons discussed previously.  It was a

4   reasonable tactical decision for counsel to contend that Guillen, who

5   pleaded guilty to manslaughter in connection with the same incident,

6   was the shooter.  There was evidence Guillen was wearing blue jeans on

7   the night of the incident (R.T. 615-16).  In closing, Petitioner's

8   counsel invited the jury to consider the color of Guillen's pants as

9   noted on Guillen's field identification card, and argued that Guillen

10  wore "the shooter's clothes" (R.T. 877-79).  Furthermore, counsel

11  mentioned the evidence that the shooter's pants and top were dark, but

12  that the field identification card for Petitioner showed that

13  Petitioner wore tan pants and a white T-shirt (R.T. 857-58, 866).

14  Petitioner's unsupported speculation that Fernandez killed Medina from

15  some unidentified motivation somehow connected with Fernandez' alleged

16  criminal activities does not suffice to show counsel's ineffectiveness

17  in failing to target Fernandez, rather than Guillen, as the shooter.

18  See Cooks v. Spaulding, 660 F.2d at 740 (9th Cir. 1981) (speculation

19  insufficient to show Strickland violation).

20

21       C.   **Alleged Evidence that the Gun Found at Petitioner's House**

22            **Assertedly Was Not the Murder Weapon**

23

24       Petitioner contends that "the **murder weapon**, described by all

25  [sic] the witnesses, could not have been the murder weapon used by the

26  shooter," (Petition, p. 14).  This unclear statement is not much

27  clarified by Petitioner's allegation in the Traverse that his counsel

28  "failed to adequately argue to the jury that there was no murder

47

1  weapon" (Traverse, p. 20).  Petitioner contends the prosecution

2  introduced into evidence the gun seized from Petitioner's home and

3  "offered it to the jury as the likely murder weapon" (Traverse,

4  p. 21).  It appears Petitioner contends that the gun seized from

5  Petitioner's home assertedly was "blue steel" or black in color,

6  rather than the "chrome" color assertedly described by witnesses

7  (Traverse, p. 21).  According to Petitioner, the prosecution knew that

8  the gun "they were displaying" was not the murder weapon (Traverse,

9  p. 21).

10

11       Contrary to Petitioner's allegations, the prosecution did <u>not</u>

12  introduce any gun into evidence.  At trial, Detective Zambos testified

13  he found a .357 magnum revolver in Petitioner's house (R.T. 429).

14  However, the prosecution did not introduce this gun into evidence.

15  During the medical examiner's testimony, the prosecution marked for

16  "reference" a photograph of a revolver and a photograph of a

17  semiautomatic handgun (R.T. 378-79).  Using the photographs, the

18  medical examiner testified concerning the differences between the two

19  types of guns (R.T. 379-81).  The medical examiner testified that he

20  obtained from "evidence": (1) a .357 caliber revolver; and (2) a

21  "fired" .38 or .357 caliber bullet (R.T. 377).  The medical examiner

22  testified that a .357 caliber revolver could fire both .38 caliber

23  special ammunition and a .357 caliber magnum ammunition (R.T. 381).

24  However, as indicated above, the medical examiner could neither

25  include nor exclude the bullet as having been fired by the .357

26  caliber revolver (R.T. 385).  The photographs of the guns were not

27  admitted into evidence (R.T. 386).

28  ///

48

1  In closing, the prosecutor conceded that the medical examiner

2 could not determine whether the .357 revolver found at Petitioner's

3 house was the murder weapon, but argued that the bullet was consistent

4 with that type of weapon (R.T. 828-29).  Petitioner's counsel

5 responded by suggesting that there could be many such guns in Los

6 Angeles, and that the prosecution assertedly had introduced no

7 evidence showing beyond a reasonable doubt that the gun recovered from

8 Petitioner's house was the murder weapon (R.T. 863).

9

10  Thus, there was no direct evidence that the gun found at

11 Petitioner's house was the murder weapon, and Petitioner's counsel

12 argued as much in closing.  In any event, Petitioner's counsel

13 reasonably could have believed the jury would conclude that even a

14 dark-colored gun held by a person lit from behind by car headlights

15 could appear to be "shiny" or "chrome" colored.  Counsel reasonably

16 could have believed that putting additional focus on the gun found at

17 Petitioner's house would not be productive.  Hence, Petitioner has not

18 shown counsel acted unreasonably in failing to focus the jury's

19 attention with respect to the color of the gun.

20

21  In any event, the gun was not a significant item of evidence

22 linking Petitioner to the crime; far more significant were the

23 identifications of Edgardo Perez and Galindo, both of whom had "no

24 doubt" at trial that Petitioner was the shooter, and Guillen's

25 statement to police identifying Petitioner as the shooter.  Petitioner

26 has not shown a reasonable probability of a different result had

27 counsel elicited evidence or made argument concerning the color of the

28 gun found at Petitioner's house.

**D.    The Alleged Absence of Bruising and Swelling on Petitioner's Face**

Petitioner contends counsel failed to raise at trial the alleged absence of any bruising or swelling on Petitioner's face (R.T. 22).[19] The record clearly shows otherwise.  On cross-examination of Detective Zambos, Petitioner's counsel elicited Zambos' testimony that, when Zambos arrested Petitioner on July 17, Petitioner had no bruises (R.T. 624).  On direct examination of Petitioner, Petitioner's counsel elicited Petitioner's testimony that Petitioner did not have a fight with anyone at a liquor store, and did not have any bruises on his face on the night of the incident (R.T. 739, 749).  In closing, Petitioner's counsel argued that Detective Zambos had put words into Guillen's mouth by assertedly suggesting to Guillen that Petitioner had facial injuries (R.T. 870-71).  Petitioner's contention that counsel ineffectively failed to develop and present evidence that Petitioner assertedly had no facial bruising on the night of the incident is wholly without merit.

**E.    The Color of Petitioner's Pants**

As discussed above, Petitioner's counsel did not fail to develop evidence, or argue to the jury, that the color of the shooter's pants assertedly did not match the color of the pants worn by Petitioner, as Petitioner alleges.  Counsel elicited Alex's testimony that Alex did

---

[19]    As mentioned above, in Guillen's statement to police Guillen said Petitioner looked like he had been in a fight (Supp. C.T. 19, 25).

1  not recall that the shooter wore tan pants, and Petitioner's testimony
2  that he wore "light colored" clothing (see R.T. 691, 739).
3  Petitioner's counsel argued to the jury the asserted inconsistency
4  between the shooter's pants allegedly being dark and Petitioner's
5  pants allegedly being tan (R.T. 857-58, 866).  Petitioner has not
6  shown counsel's ineffectiveness in this regard.

8      **F.    Conclusion**

10     For the foregoing reasons, the state courts' rejection of the
11 claims of ineffective assistance of counsel alleged in Ground Three of
12 the Petition were not contrary to, or an objectively unreasonable
13 application of, any clearly established Federal law as determined by
14 the United States Supreme Court.  See 28 U.S.C. § 2254(d).  Petitioner
15 is not entitled to habeas relief on Ground Three of the Petition.

17                      **RECOMMENDATION**

19     For the reasons discussed above, IT IS RECOMMENDED that the Court
20 issue an Order: (1) approving and adopting this Report and
21 Recommendation; and (2) denying and dismissing the Petition with
22 prejudice.

24     DATED: July 8, 2008.

26                    _____
                            CHARLES  F.  EICK
27                  UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number. No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.